FILED
CLERK, U.S. DISTRICT COURT

SEP 1 2 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| Mark D. Rome, | ) | SA CV 04-00332 JVS( PJWx) |
| | ) | |
| | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| Plaintiff(s), | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Glaxo Smith Kline, Inc., et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant(s). | ) | |
| | ) | |

1

2

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

4

THE COURT:   This matter is before the Court for a
bench trial on Mark Rome's claim against SmithKline Beecham
Corporation, which has commonly been referred to in this
case as GSK, on two claims.   One, a claim of violation of
Section 12940 of the California government code for age
discrimination, 12940(a), and a separate and distinct claim
for retaliation under 12940(h) of the government code.

In coming to my findings of fact and conclusions
of law, I have considered the evidence presented at trial,
including the deposition evidence.   I have considered the
parties' memoranda of contentions of law and fact, and I
have also considered the parties' proposed findings.

I think the most appropriate place to start with
is with the parties' pretrial conference order, which I
believe provides a very good basic factual framework for the
case.   So I am going to recite and adopt the facts stated in
the pretrial conference order.   I find that the record
supports by a preponderance of the evidence each of the
following facts which the parties have stipulated to:

Mark Rome was born on September 9, 1953.   Rome was
hired in 1977 by GSK's predecessor.   At the time of his

1     termination in 2003, Rome was 49 years old.  In October

2     2003, Ruth Christ was hired to replace Rome.  Christ was 34

3     years old.  Malia Owens, Rome's supervisor, was 36 years old

4     when Rome was terminated by GSK.

5                In 2003, GSK had a progressive discipline policy.

6     In 2003, Rome held the position with GSK of senior executive

7     sales representative in the Southern California Medical

8     Group Team.  Rome's direct supervisor was Malia Owens.

9                In 2003, Owens held the position of medical group

10    development manager.  In June 2003, GSK awarded La Vida

11    Foundation two educational grants in the amount of $2,500

12    each.

13                Rome was terminated from his employment with GSK

14    on August 14, 2003.  The reason given Rome for the

15    termination of his employment and set out in the separation

16    notice provided Rome that day was that he had, quote,

17    "violated GSK's employee conduct policy, specifically GSK's

18    grants policy and procedure, Section 6.3, procedure for

19    approving and processing grants," close quote.

20                In 2003, GSK's grants policy and procedure was set

21    forth in Chapter 6 of the GSK Commercial Policies and

22    Procedures Manual.  In 2003, Section 6.3 of GSK's grants

23    policy and procedure stated, quote, "do not, single quote,

24    'promise,' close single quote, "a grant to a customer or

25    sign any agreement before a grant is fully processed and

1    approved through the GSK Grants Department," close quote.

2         In 2003, GSK's grants policy and procedure also

3    stated, quote, "Only expenses for meals for a specific event

4    are reimbursed, and the expenses are included in the entire

5    amount of the grants," close quote.

6         On June 11, 2003, a memo was distributed via

7    e-mail to GSK's field personnel and forwarded by Malia Owens

8    to Mark Rome and/or the members of the medical group which

9    stated, quote, in all caps, "Never promise a grant before it

10   has been approved by the Grants Department," closed quote.

11        In 2003, GSK's employee conduct policy provided

12   that, quote, "Certain violations of company regulations are

13   so serious that they may call for immediate discharge or

14   other appropriate action.  Such actions include, but are not

15   limited to:  No. 28, violation of commercial policies and

16   practices," closed quote.

17        On July 21, 2003, Owens met with Rome regarding

18   Dr. Richards' complaint.  On July 22, 2003, Rome called

19   GSK's Employee Response Center to make a complaint about

20   Malia Owens.  On July 31, 2003, Rome completed two

21   California Department of Fair Employment and Housing

22   Complaint of Discrimination Forms.

23        On July 31, complaints of discrimination were

24   received by the Department of Fair Employment and Housing,

25   DFEH, on August 11, 2003, in its Sacramento office.  The

1   only written notice of the July 31, 2003, complaints of

2   discrimination issued to GSK were a Notice of Filing of

3   Discrimination Complaint and a Notice of Case Closure, both

4   of which were sent to GSK by the DFEH on August 20, 2003.

5          On August 15, 2003, GSK completed an Amended DFEH

6   Complaint of Discrimination Form, which GSK also received

7   notice of in correspondence dated August 20, 2003.

8          Between July 2002 and August 2003, Rome applied

9   for seven different positions within GSK -- four oncology

10  account manager positions and three HIV clinical specialist

11  positions.  Rome was not offered any of these seven

12  positions.

13         In 2003, GSK maintained an equal opportunity

14  policy.  In 2003, GSK maintained a harassment-free workplace

15  policy which, among other things, provided retaliation

16  against an employee by his supervisor or another employee

17  for bringing a complaint is prohibited.

18         It's conceded by all parties that with respect to

19  the DFEH discrimination claim, plaintiff has made out a

20  prima facie case.  I am not going to recite the elements of

21  the prima facie case, but once a prima facie case has been

22  made, a burden shifting occurs under principles announced in

23  in McDonnell Douglas Corp. v. Green, 411 U.S., 792, and in

24  Guz v. Bechtel International, Inc., 24 Cal. 4th, 317, 2000.

25         Basically once the plaintiff has established a

1    prima facie case, it then becomes the burden of the employer

2    to establish a nondiscriminatory reason for the action

3    taken.  If the employer comes forward with that, the

4    ultimate burden then shifts back to the plaintiff to prove

5    by a preponderance of the evidence that the plaintiff has

6    been discriminated against on an unlawful basis.  In this

7    case, age.

8          I find that with respect to the discrimination

9    claim, plaintiff has made a prima facie case, and for

10    reasons which I will elaborate in a moment, GSK has come

11    forward with a legitimate nondiscriminatory reason for the

12    actions taken, which under the discrimination count include

13    termination, failure to offer him certain employment

14    opportunities, and alleged harassment.

15          With respect to the second claim, retaliation for

16    making a complaint with regard to conduct prohibited by the

17    DFEH, the parties concede that with the exception of one

18    element plaintiff has made out a prima facie case.  That

19    element is whether the complaint which Mr. Rome made to the

20    GSK Human Resources Department on January 22, 2003, was in

21    fact a claim of age discrimination or conduct otherwise

22    protected under the statute.

23          Exhibit 66 is the Human Resources employee

24    relations intake sheet which records the complaint that Mr.

25    Rome made at the end of the day on July 22, 2003.  He says

1    in part the reason for his call today is that he wants to

2    find out what his rights are as far as not feeling harassed

3    to find another job.

4          He also stated many times during the conversation

5    -- that is, with Ms. Owens -- he is afraid of retaliation,

6    that he's being harassed and discriminated against.

7          He also states on page 2 according to the report,

8    he said that she -- again referring to Owens -- makes

9    comments about how much money he makes, and this makes him

10   feel like she wants to get someone younger that would not be

11   paid as much.

12         Taking the entire context of this document, I

13   believe that a prima facie showing of having made a

14   complaint for discrimination on the basis of age and

15   harassment on the basis of age is made out.  I believe that

16   the showing is weak, but I believe that one reading this

17   would come away with the view that Mr. Rome had reported

18   that adverse actions were being taken against him at least

19   in part on the basis of his age.

20         So for that reason, all other elements of the

21   claim for retaliation with respect to prima facie having

22   been conceded, I find that plaintiff has made a prima facie

23   case of retaliation.  I specifically find, although the

24   showing is weak, that the claim made in Exhibit 65 is a

25   claim of discrimination and other conduct violative of the

1   DFEH statute.

2          Again, I find that GSK has come forward with a

3   legitimate nondiscriminatory reason for the negative action

4   which it took following this complaint, namely, his

5   termination.  I believe that the record establishes that

6   discipline for violation of the grants policy is a

7   legitimate nondiscriminatory basis for taking disciplinary

8   action.

9          Because the grants policy figures so prominently

10  in this case, I think it's worthwhile, although I noted

11  those in the summary, to discuss in more detail the relevant

12  corporate policies.  Exhibit 21 is GSK's corporate conduct

13  policy.  That policy points out in paragraph A:

14          "Certain violations of company regulations are so

15  serious that they may call for immediate discharge or other

16  appropriate disciplinary action.  Such actions include, but

17  are not limited to, No. 28, his violation of commercial

18  policies and practices."

19          Although GSK had a progressive discipline policy,

20  it was clear from the employee conduct policy that there was

21  certain conduct that fell outside the progressive discipline

22  policy and in and of itself warranted termination as a

23  sanction.

24          The grants policy is repeated in a number of

25  places in the record, including Exhibit 18, Commercial

1    Practices and Policies Resource Manual for U.S. Pharma.  At

2    page GSK 0774, the following appears:  "1.  Do not 'promise'

3    a grant to the customer or sign any agreement before a grant

4    is fully processed and approved through the GSK grants

5    policy."

6             Arjun Rajaratnam gave testimony about the reasons

7    behind the policy and the seriousness of the policy.  I find

8    Mr. Rajaratnam, who is the U.S. compliance officer based in

9    Chicago, to be credible and honest and knowledgeable in this

10   subject area.  He explained in paragraph 7 of his direct

11   declaration the kickbacks were a potential problem,

12   potential significant problem for a pharmaceutical company

13   such as GSK.

14            He pointed out that depending on how grants were

15   given and in what manner, they could potentially violate 42

16   USC, Section 320a-7B(b).  Violation of that statute held the

17   potential for a violator being excluded from federal health

18   care programs, which I find to be a significant potential

19   problem to a company such as GSK.

20            He also alluded to two specifics litigations which

21   were recently current in 2003 which resulted in major fines

22   being paid by pharmaceutical companies.  One case involved

23   Tap Pharmaceuticals, Inc., and resulted in a payment of

24   $875,000 to resolve civil and criminal charges.  He also

25   recited another matter in June 2003 involving AstraZeneca

SHARON SEFFENS, U.S. COURT REPORTER

1   Pharmaceuticals, which resulted in a payment of $355

2   million.

3            In each case, part of the alleged improper conduct

4   involved grants abuses.  I find that enforcement of the

5   grants policy for the reasons stated by Mr. Rajaratnam

6   constitute a legitimate nondiscriminatory policy in terms of

7   the DFEH law.

8            It's probably worthwhile to go back and review Mr.

9   Rome's career.  He began in 1977.  He had a limited number

10  of promotions -- or 1973.  He had a limited number of

11  promotions through the '70s and '80s.  The trial testimony

12  of his supervisor immediately prior to going to the medical

13  sciences group was favorable to him.  Greg Dial praised his

14  efforts.  He gave him good reviews in his performance

15  appraisals for 1997, 1998, and 1999 -- those being Exhibits

16  199, 200, and 202.

17           In fact, at the age of approximately 44 or 45, an

18  age that would put him in the protected class for age

19  discrimination, he in fact received a promotion from GSK.

20           In 2000, the Medical Sciences Group was formed,

21  and he was hired into that group at the age of approximately

22  46.  That hiring decision was made directly by Malia Owens.

23  That decision suggests at least at the time he was hired

24  into that group that there was no pattern or practice of

25  discrimination on the basis of age.

1           The nature of the activity in the medical sciences

2    group differed from the previous sales positions which Mr.

3    Rome had held in that he was now working with groups and

4    coordinating with other groups outside his own medical

5    services group.  That activity required different skills

6    that he had engaged in in his prior activities.

7           As he continued from 2000 to 2003, it became clear

8    that there were from time to time problems with his

9    performance, problems with coordinating with other salesmen,

10   problems with coordinating with clients.  At the same time,

11   he received praise from time to time from Owens, including

12   praise in written reviews or written reports in 2003, April

13   through July 2003, including Exhibits 215, 216, and 217.

14          The plaintiff has characterized this as a roller

15   coaster experience.  On the contrary, I find that Owens was

16   a fair manager, demanding, who praised when she thought

17   praise was due and demanded improvement when she thought

18   improvement was due.

19          Her overall ratings for the year 2001 and 2002

20   were average as the scheme worked out in the 2001 report and

21   M or middle for the scheme used in the 2002 report.  In each

22   instance, he was given the middle ranking of five possible

23   rankings.

24          The April 2003 dinner meeting is the genesis for

25   much of the dispute in this case.  That meeting was attended

1   by Cassandra Richards, a consultant working as an

2   independent contractor for La Vida; Mr. Miller; and Niki

3   Guluchi.

4          Cassandra Richards testified in this court that

5   Mr. Rome made certain promises of grants.  She testified

6   that he had made a promise of a grant in the amount of

7   $20,000 to $50,000, and it caused her to believe that

8   $20,000 was the minimum amount.  Ms. Richards was evasive;

9   she was combative and was one of the poorer witnesses to

10  appear before me in almost 10 years on the bench.

11         Having said that, there may have been a reason for

12  her definite lack of chemistry, if not antipathy, toward

13  plaintiff's counsel, Mr. Scott, given that she had been sued

14  for defamation and other alleged misconduct.

15         Notwithstanding her evasive manner, I find that in

16  words or actions Mr. Rome caused her to come away from the

17  meeting that she had a commitment of grant funds.  Mr.

18  Miller testified that there were no mention of any grant

19  commitment in his presence.  Mr. Miller wasn't present the

20  whole time, but I can infer that he was present for the

21  majority of the meeting.  And I can also infer that he was

22  knowledgeable of the grants program and would have

23  recognized and testified to a grants violation had one in

24  fact occurred in his presence.

25         Richards also came away from that meeting

1    understanding that Mr. Rome could provide, in addition to

2    educational grants, payment for food in addition to grants.

3    As Mr. Rome clearly testified, he understood that the policy

4    prohibited making any promises of a grant.  As he testified

5    at page 57 of the morning August 12th session at --

6    beginning at line 6:

7              "Question:  And you can't suggest in any way to a

8    customer that you can get them a grant; isn't that true?

9              "Answer:  You can't tell them it would be

10   successful, no.

11             "Question:  Am I right in saying you can't say

12   anything that would imply in any way that you could get them

13   a grant?  Is that true?

14             "Answer:  If you could get them, no, you can't."

15             My conclusion is that Mr. Rome took actions at

16   that meeting that violated his clear understanding of the

17   policy either by making an express promise of a grant or by

18   causing Dr. Richards to believe that he had made a

19   commitment by implying such support.

20             Nothing further in terms of this dispute of

21   significance occurs until July 18 when Mr. Rome contacts his

22   supervisor, Malia Owens, to tell her that Dr. Richards is

23   concerned and wants to talk to his supervisor.  I am not

24   clear on the record whether Mr. Rome gave Ms. Richards Ms.

25   Owens' telephone number or Ms. Owens called Dr. Richards.  I

 1    have seen it two ways in the evidence.

 2           My suspicion from her notes is that Ms. Owens

 3    called Dr. Richards.  In that conversation, Dr. Richards

 4    clearly made the allegation that a firm commitment of a

 5    grant of at least $20,000 had been made during the course of

 6    the meeting, and she also indicated that a commitment for

 7    food over and above grants had been made.

 8           I believe Ms. Owens was entitled to regard that

 9    communication as credible.  Dr. Richards was acknowledged

10    within GSK to be a thought leader, and she was already a

11    speaker in programs for GSK.

12           Now, I asked Ms. Owens whether she gave those two

13    factors any weight in evaluating the statements of Dr.

14    Richards, and she said she did not.  But it clearly

15    indicates to me that Dr. Richards was no stranger and that

16    there was no reason to distrust the allegations she made.

17           Ms. Owens also testified that she called Niki

18    Guluchi on the same day -- July 18th, 2003.  Ms. Guluchi

19    according to Ms. Owens also confirmed that a promise had

20    been made of food outside of the amount of the grants.  I

21    believe that Ms. Owens was entitled to take that as

22    corroborative evidence.  She was aware -- I am not clear

23    whether she was aware of Ms. Guluchi's position, but I think

24    she was entitled to take that as corroborative evidence.

25    She had no reason, I believe and find, to doubt either

1    Richards or to doubt Guluchi.

2              In the days that followed, there were several

3    interactions between Mr. Rome and Ms. Owens.  Those

4    interactions cause me to believe that in those conversations

5    Mr. Rome at least admitted in part a grants violation.  I

6    believe that the manner in which Mr. Rome described the

7    nature of the complaint indicates that he understood that

8    the complaint was for making the promise.

9              On July 21, as reflected in Exhibit 22, Ms. Owens

10   counseled Mr. Rome with respect to the proper manner in

11   which to deal in grants.  She again had a session with him

12   in Exhibit 64, a document called GSK coaching report.  The

13   document reflects that she counseled Mr. Rome and discussed

14   grants policy.

15             On page GSK 1048, a portion of the form is filled

16   out by Mr. Rome.  Ms. Owens testified that the manner of

17   preparation -- namely, that the document was generated off a

18   laptop with both Mr. Rome and Ms. Owens sitting side by side

19   and Mr. Rome keying input.  One entry which he made is "make

20   no promise anymore except to look into customer's requests."

21   I believe on the basis of the testimony of Malia Owens that

22   the only discussion of promises in that meeting related to

23   grants, that Mr. Rome in fact did make an admission that he

24   had violated the policy and committed to do it no more.

25             There were inconsistencies in Mr. Rome's

1   recitation to Ms. Owens at various points as to what went on

2   at the April meeting.  At one point, during the course of

3   their discussions he admitted that there had been discussion

4   of grants.  At others, he denied that there had been any

5   discussion of grants at that meeting.

6           I believe that on the basis of Malia Owens'

7   discussions with Mr. Rome, the two telephone conversations

8   with Dr. Richards and Ms. Guluchi, that she had a reasonable

9   basis for concluding that the grants policy was violated.  I

10  make that finding separate and apart from a finding that Mr.

11  Rome in fact said something or did something at the April

12  meeting to cause Dr. Richards to believe that she had been

13  made a commitment, a promise of a grant in some form or

14  another.

15          I think the key point for the analysis of GSK's

16  conduct is not necessarily whether misconduct in fact

17  occurred, but was a credible report made?  I find that a

18  credible report was made, even if in fact the alleged

19  conduct did not occur, because I believe that Ms. Owens was

20  entitled to believe Dr. Richards for the reasons I have

21  indicated she was entitled to believe Dr. Richards, and I

22  believe she also had the admissions of Mr. Rome.

23          On July 22 at the end of the day, as I indicated,

24  Mr. Rome made a report to HR stating his complaints.  I find

25  significant in that report that he did not state that he was

1   being set up for termination for a false violation of the

2   grants policy or that there was anything awry with regard to

3   his discussions on the 18th and the 21st with Ms. Owens.

4          It seems to me that if he thought he was being

5   dealt with unfairly by Malia Owens it would have figured in

6   his complaint on the 22nd.  I also find somewhat suspect the

7   timing of the complaint, but in a sense, that's not relevant

8   here for reasons I will mention.

9          He had worked for almost four years for Ms. Owens

10  and had made no formal complaint to this point.  Yet he

11  finds himself in the situation the day before where there is

12  a potential for some significant disciplinary action.  That

13  may cause me to question the accuracy of the complaint.  But

14  for purposes of the retaliation claim, the question is was

15  he retaliated for making the claim, whether the claim was

16  right or wrong?

17         I also note in his dealings with Ms. Stellings

18  following up on his complaint, he again had an opportunity

19  to raise the issue of whether he was being set up for an

20  inaccurate or misleading set of discipline based on

21  violation of the grants claim.  There is no mention of that

22  in Exhibit 56, Ms. Stellings' notes, of the conversation

23  with him.

24         From this point, the examination of the grants

25  violation claim within GSK took a number of different

1    directions.  First of all, Ms. Stellings reported it to Mr.

2    Rajaratnam.  It is true that Compliance didn't do any fact

3    finding on its own.  Mr. Rajaratnam accepted the level of

4    fact finding as it had been conveyed to him by Ms.

5    Stellings.

6            I don't believe he did anything inappropriate.  I

7    think for his purposes he was asked what the appropriate

8    form of discipline was, and he indicated in his declaration

9    here at trial that he found that a violation of the grants

10   policy in 2003 was sufficient to appropriately apply the

11   sanction of termination.

12           He also acknowledges that there could have been

13   other sanctions.  He does not specifically recommend what

14   advice he conveyed back through Ms. Stellings.  It appears

15   that there was discussion of both termination and

16   sanctioning him with a reprimand and a reduction in

17   incentive compensation.  It's clear, I believe, in the

18   record that Ms. Stellings identified those two possibilities

19   as well.

20           The net of Mr. Rajaratnam's view was conveyed to

21   Mr. Romanowski.  At that point, Mr. Romanowski was the

22   acting regional vice-president and the direct superior of

23   Malia Owens.  I find that the decision to terminate Mr. Rome

24   was made by Mr. Romanowski with the input of a number of

25   different people:  one, with the input of Malia Owens; two,

1  with the input of Ms. Stellings; three, with the input of

2  Mr. Rajaratnam; and potentially with the input of the senior

3  vice-president for HR, Mr. Sun.

4          The decision-making process was, I believe, fair

5  and had a factual basis.  I also find that there were

6  imperfections in the decision-making process, and it could

7  have been a better one in a number of different ways.  One,

8  Paul Miller was never interviewed.  Two, conceivably

9  Compliance might have conducted its own factual

10  investigation.  But it's clear to me that Mr. Rajaratnam

11  felt that he had the facts.  HR might have contacted Mr.

12  Miller, or there might have been independent contact with

13  Ms. Guluchi and Dr. Richards, neither of which occurred.

14          But the issue in this case is not whether a

15  perfect disciplinary process was engaged in but rather

16  whether it was so flawed as to be incredible.  I find it

17  flawed but not so flawed as to be incredible.  As recognized

18  by Guz at 24 Cal. 4th, 358, if the employer's true reasons

19  for -- the employer's true reasons need not necessarily have

20  been wise or correct.  While the objective soundness of an

21  employer's proper reason supports their credibility, the

22  ultimate issue is simply whether the employer acted with a

23  motive to discriminate illegally.

24          The level of investigation here does not rise in

25  my view to the point where it undermines the credibility and

175

1  believability of the stated reason -- violation of a grants

2  policy.

3          The facts as presented indicated that most of the

4  decision makers did not know what the subject matter of Mr.

5  Rome's complaint was.  I believe when the complete passage

6  from Mr. Owens' testimony was read, it's clear that she did

7  not know that the claim was allegedly for one of

8  discrimination rather than harassment.

9          I find that even with a policy of confidentiality,

10  it was legitimate to inform her, because she was the alleged

11  harasser of the complaint, so that she would desist from

12  further alleged harassing conduct.

13          I also find it was appropriate for Ms. Stellings

14  to know, and I also find that from her notes that she was

15  aware of the complaint but not the nature.

16          I find that HR in fact received the notes which

17  Ms. Owens took on July 19 of her discussions, telephone

18  calls with -- July 18 of her telephone calls with Mr. Rome,

19  Dr. Richards, and Guluchi.  I find that she did convey to HR

20  through the transmittal of that memo and her coaching memos

21  the essential facts, including the presence of Paul Miller.

22          While Paul Miller was not contacted, there wasn't

23  an effort to cover up the fact of his presence or to

24  discourage anyone from doing that on an independent basis.

25          So I find that the decision to terminate was not

1    pretextual, that it was supported by a good-faith

2    determination that Mr. Rome had violated the grants policy.

3    So I reject the claim for retaliatory termination.

4         There is other conduct that is alleged in this

5    case to support a DFEH violation.  That principle rests on

6    how Mr. Rome was treated during the course of the number of

7    interviews he had for jobs in 2003.  It was clear that by

8    March of 2003 he was looking for another job.  He and Malia

9    Owens had had that discussion.

10        He talked with Eric Kimbro about regional oncology

11   positions.  There were three positions available, none of

12   which went to Mr. Rome.

13        Mr. Kimbro testified that among his reasons for

14   not giving one of those positions to Mr. Rome was that the

15   others were more qualified.  He also took into account the

16   commuting that Mr. Rome would have to engage in if he took

17   over territories in Glendale, Long Beach, or the hospital

18   region.  He also noted that Mr. Rome was not familiar with

19   these territories.  He testified that he had direct personal

20   knowledge of the capabilities of all three of the

21   individuals he hired.

22        Steve Rooney was in his mid 30s.  However, Ms.

23   Janice Kerns, was 42 years old, in other words, an

24   individual in the protected class for age discrimination.

25   Moreover, Mr. Rome testified that she had the same

1   qualifications as he did.  The third individual placed in

2   the Hospital Division, Daniel Dinnett (phonetic), was 53.

3        I find that no age discrimination occurred in

4   these hiring decisions, that no hiring decision occurred

5   when individuals in the protected class were hired, which

6   was the case in two out of three instances; and I find that

7   the reasons given for hiring Mr. Rooney and the criticisms

8   of Mr. Rome's qualifications for these particular jobs were

9   not pretextual.

10        Richard Esparza testified to three available HIV

11   positions.  Mr. Esparza interviewed Mr. Rome for the first

12   position in Orange County.  He testified that Mr. Rome did

13   not have a strong science background, he was not located in

14   the territory, and that he did not have a strong interest in

15   the subject matter of HIV although he had previously worked

16   in positions where he was selling HIV drugs.  Mr. Esparza

17   stressed the need for a strong interest in the science

18   because of the rapidly evolving nature of the science for

19   treating HIV.

20        I find that these were nonpretextual reasons and

21   nondiscriminatory reasons for not offering that first

22   position to Mr. Rome.  The position went to Crystal Robb,

23   who was in her 30s.  Because of his evaluation of Mr. Rome's

24   capabilities, Mr. Esparza testified that he did not consider

25   him for the -- that he did not interview him for the

1    subsequent two positions -- an HIV position that came open

2    in the spring of 2003 in Los Angeles and another one that

3    became open in August 2003 in Los Angeles.  Those positions

4    went to younger people.

5           The second L.A. position went to David Joe

6    Palazzio.  Among the factors in hiring him were diversity.

7    Mr. Esparza testified that Mr. Palazzio was either in his

8    late 30s or early 40s.  For the first L.A. position, June

9    Alphonso was offered the position, in his 30s, a premed with

10   a biology background, and brought diversity to the job.  He

11   subsequently declined the job.  The job was then offered to

12   Doleta Minix in her 30s.

13          I find that none of these hiring positions were

14   made adversely to Mr. Rome on the basis of age.  I find that

15   the reasons offered for the reasons not to hire him and the

16   reasons to hire the individuals in fact hired were

17   legitimate, nondiscriminatory, and nonpretextual.

18          Mr. Rome was also considered by Scott Barnes in

19   June 2003 for a position, another oncology position, this

20   one in the San Diego territory.  He did not interview Mr.

21   Rome.  He testified that he had had an unfavorable exposure

22   to Mr. Rome while working for a competitor.  He found that

23   -- he believed that Mr. Rome had poor work ethics and did

24   not participate and come to important lunches with doctors.

25          I think the evidence in this case is made clear

1    that one of the chief vehicles for getting to know doctors

2    is to go to lunches that are set up based around their

3    schedules or for dinner meetings.  To me that goes as a

4    significant criticism based on this record.

5           Mr. Barnes also noted that Mr. Rome did not live

6    in the territory.  The actual job went to Nancy Morrison, a

7    53-year-old who was doing the same job in another territory.

8    Mr. Barnes testified that there would be absolutely no

9    startup time since Ms. Morrison would perform the same

10   duties she had been performing.

11          I find that the reasons offered and the decision

12   made with respect to the San Diego position were not

13   pretextual and that the reasons offered were legitimate

14   nondiscriminatory reasons.

15          There is also testimony that Mr. Rome may have

16   been considered or mentioned for a possible position working

17   in David Cohen's group.  Mr. Cohen testified that he

18   couldn't understand why Mr. Rome would be interested in a

19   lateral, basically downward, move.  I believe he expressed

20   concerns about the reason and the motivation for an

21   individual wanting to take a lesser significant job.  That

22   job offer was in fact extended to Natalie Hallet, a woman in

23   her mid 20s.

24          There is some indication that Mr. Rome never

25   actually applied for the job which Mr. Cohen had in the

1    Inland Empire.  If you review the hiring decisions,

2    including the Inland Empire decision which may or may not

3    have involved an actual request for a job, one finds that

4    there was a wide variety of ages of individuals who received

5    the job.  Hallet was in her mid 20s.  Rooney was in his mid

6    30s.  Robb was in her mid 30s.  Alphonso was in his mid 30s.

7    Kerns was 42.  Dinnett was 53.  Morrison was 53.  Palazzio

8    was in his mid 30s to early 40s.

9         This does not demonstrate to me a pattern of

10   disparate treatment of elderly people.  It in fact reflects

11   that a range of people of different ages were hired for

12   various positions that were available in 2003.

13        I have already found that the reasons given for

14   the individual hiring decisions were neither pretextual nor

15   discriminatory.  But apart from those individual decisions,

16   there is no basis on this record to infer disparate

17   treatment from the pattern of hiring decisions.  I find no

18   basis of discrimination under the statute on the basis of

19   hiring discrimination.

20        There was other conduct alleged that's supposedly

21   reflective of discrimination on the basis of age.

22   Supposedly, Mr. Rome was criticized by Malia Owens in a

23   manner that put in question his age and criticized his age.

24   However, the only one that testified to such conduct at

25   trial was Mr. Rome.

1          Jason Shoup, an individual in the group, never saw

2    Owens demean Mr. Rome.  Millie Reyes and Jason Shoup never

3    heard the comment by Malia Owens that Mr. Rome was getting

4    paid twice as much and he should be working twice as hard.

5    And one would expect that to -- at least someone to have

6    heard that.

7          In his direct testimony, Mr. Rome states that

8    those statements were made at district meetings.  On the

9    afternoon of August 12th, at page 28, he testifies that that

10   statement was made at district meetings.  Yet there is no

11   corroborative evidence.

12         I find to the extent that any statements were in

13   fact made with regard to Mr. Rome's age that they were

14   sporadic and did not rise to the level of harassment or

15   discrimination.

16         With respect to the several comments that were

17   corroborated about Ms. Owens having an old team, I find

18   those states innocuous.  Apparently at a meeting, a lunch

19   meeting in Georgia, Ms. Owens said something to the effect

20   that her team was getting old because they weren't going to

21   go out that night.  There is no evidence that anyone was

22   singled out for that claim, and there is no evidence of

23   anything other than a hard-working group of salesmen who

24   were wanting to get a good night's sleep and not go out.

25         A similar comment was made to the team in

1    San Francisco.  It was reported in the testimony of Millie

2    Reyes.  And the testimony was to the same effect -- Malia

3    Owens saying that her team was getting older, and she would

4    understand if they didn't want to go out after dinner.  I

5    don't find that either of those amount to any form of

6    discrimination or harassment on the basis of age.

7             I believe that the harassment that Mr. Rome

8    principally referred to was captured in the part of his

9    deposition that was read into the record; namely, harassment

10   in the form of Ms. Owens being a demanding supervisor.

11            This passage from Mr. Rome's deposition was read

12   in during his examination at 423, beginning at line 21:

13            "Question:  But the harassment you're complaining

14   of related to the performance of your job duties?

15            "Answer:  The performance of my job duties and

16   specifically in pushing me since, like I said, the year

17   before, 'Mark, it's obvious that we're not getting along,

18   and what do you think about moving to a different manager?'

19   I said, 'Absolutely.'  I was all for it."

20            The remark that Mr. Rome states is a remark he's

21   attributing to Ms. Owens in context.  I don't believe this

22   record establishes that he was subjected to any harassment

23   violative of the DFEH statute.

24            I believe that in some instances there was reason

25   to question the veracity and credibility of Mr. Rome.  Great

1   inflation or resume padding may be a small thing, but at

2   trial, Mr. Rome was confronted with at least three instances

3   in which he was representing himself contemporaneously to

4   this litigation with accomplishments that were belied by his

5   college transcript, which is in the record.  As I say, I

6   found his explanations not credible.  And while these are

7   small things, they cause me to question his truthfulness.

8           I also note that he was impeached a number of

9   times during his testimony, including on the question of

10  whether Owens told him that the allegation was a promise.

11          So in sum, as far as my factual findings go, I

12  find that he was not terminated as an act of retaliation for

13  making a protected complaint for age discrimination.  I find

14  that he was not discriminated against in hiring decisions,

15  and I find that he was not harassed or discriminated on the

16  basis of age.

17          With regard to one additional episode brought out

18  of supposed discrimination -- namely, he wasn't given the

19  trip to Hawaii -- I think the record is clear that a number

20  of factors went into that decision and that others

21  contributed accomplishments other than simply sales.

22          A few other additional points.  I find on this

23  record that there was a motive for Mr. Rome to make a

24  promise or a commitment of grants.  It is clear that he was

25  interested in developing a relationship with La Vida.  It is

```
1    indicated in Exhibit 164 that La Vida was becoming
2    increasingly important with its upcoming merger with
3    Prairie.
4          I also find that this record establishes that he
5    wasn't the only one who was terminated for grants
6    violations.  Mr. Romanowski testified that he was aware of
7    others, although a number of district managers and other
8    managers testified that they weren't aware of anyone else
9    being terminated.
10          With regard to conclusions of law, number one, I
11   find that the Court has diversity jurisdiction under 28 USC
12   Section 1332.  The parties are different citizenships, and
13   the amount in controversy is clearly more than $75,000.
14          I find that a prima facie case of age
15   discrimination was made out.  I find that the burden having
16   shifted to GSK to provide a nondiscriminatory, nonpretextual
17   reason for the actions it took that Mr. Rome thereafter
18   failed to carry his ultimate burden to establish that the
19   actions taken against him were on the basis of age.
20          With respect to the retaliation claim, I find that
21   Mr. Rome made out a prima facie case in each of the
22   elements, although weakly I believe on whether Exhibit 64
23   was in fact a protected complaint, but the burden having
24   shifted to GSK under McDonnell Douglas, I find that Mr. Rome
25   did not carry his burden to ultimately demonstrate that he
```

1   was retaliated against on the basis of the complaint that he

2   made.

3           I find that GSK is entitled to judgment, and I ask

4   counsel to submit a form of judgment within 10 days.

5           Anything further?

6           MS. WILSON:  No, Your Honor.  Thank you.

7           MR. SCOTT:  No, Your Honor.

8           THE COURT:  Let me add one concluding word.

9   Although I have not found for Mr. Rome, from my experience

10  in practicing in the bench, I am deeply aware of the

11  importance in this society of a job to an individual, not

12  only in terms of their ability to support themselves but in

13  terms of how they define themselves in life.

14          I have no doubt that Mr. Rome has sustained

15  economic harm.  I have no doubt, although I need not make

16  any findings about the degree, that he has sustained some

17  emotional and psychological harm.  I am appreciative of

18  those facts.  I simply find at the end of the day that I

19  cannot attribute that harm to any unlawful conduct on the

20  part of GSK.

21          Anything further?

22          MR. SCOTT:  No, Your Honor.

23          MS. WILSON:  No, Your Honor.

24          THE COURT:  The argument was long today, but it

25  was helpful.  I believe that I had a full and complete

SHARON SEFFENS, U.S. COURT REPORTER

186

1   canvass of the evidence from both sides.  Given that this

2   trial was relatively short and I took detailed notes, I felt

3   with that detailed canvass of the evidence that I was in a

4   position to enter my findings of fact and conclusions of law

5   from the bench, and for that reason, I have done so.  Thank

6   you.

7            *(Thereupon, the proceeding was concluded.)*

8                              -oOo-

9

10

11   *Dated: September 12, 2008*

12

13

14   *James C. Sel*

15   *JAMES V. Sems*

16   *United States District Judge*

17

18

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. COURT REPORTER